### ELIAS RIDGE v. STATE.

No. A-5164.   Opinion Filed Oct. 25, 1924.
(229 Pac. 649.)

(Syllabus.)

1.   **Infants—Conditions to Warrant Death Penalty Imposed Against Boy Under 14.** In this state, under the general provisions of criminal law and procedure construed in connection with the law relating to juvenile offenders, the death penalty should not be imposed against a boy under the age of 14 years convicted of murder, unless it clearly appears that the juvenile offender was a person with a sense of responsibility, intelligence, and understanding equal to that of an ordinary person of the age of 16 years.

2.   **Same—Death Penalty for Juvenile Convicted of Murder.** To warrant the death penalty for a juvenile offender convicted of murder, the offense must be reprehensible in a superlative degree, coupled with the fact that the perpetrator was a person having an ordinary comprehension of the enormity of the offense and its consequences.

Appeal from District Court, Mayes County; A. C. Brewster, Judge.

Elias Ridge was convicted of murder, and he appeals. Modified and affirmed.

See, also, 25 Okla. Cr. 396, 220 Pac. 965.

W. H. Twine and Charles N. Harmon, for plaintiff in error.

The Attorney General and N. W. Gore, Asst. Atty. Gen., for the State.

BESSEY, J.   Elias Ridge, a negro boy of juvenile age, was by a verdict of a jury in the district court of Mayes

county found guilty of the murder of Mrs. George Adair, and his punishment fixed at death. From this judgment he appeals.

Mrs. Adair was the wife of a prominent and highly respected farmer and ranchman in Mayes county. On the day she lost her life, August 8, 1922, she and her two small children, one a baby in arms, were alone at their ranch home, the husband being some miles distant, where he was operating a threshing machine. This fact was known to Elias Ridge, a negro boy about 14 years of age, who was then living with his brother-in-law, Hardy Smith, in a tenant house near the Adair home. The Ridge boy and Hardy Smith were often employed to do odd jobs in and about the Adair home and were familiar with everything thereabouts. At the noon hour on this day Elias Ridge went into the house where Mrs. Adair was, on the pretext of inquiring about a horse bridle, and there, pursuant to plans previously laid, commenced a brutal assault upon Mrs. Adair, in the course of which she was flogged and bruised with an iron bar and a heavy stick of wood, and was cut and stabbed in a horrible manner about the face, neck, arms, and body; nearly all of her clothing being torn from her body. Her skull was crushed in two places, and several of her bones were broken. Mrs. Adair was a large woman, about 35 years of age and in good health, so that her physical condition enabled her to make a heroic resistance to the assault, covering a period of 15 or 20 minutes, and continuing in different parts of the house, and on the back porch. She finally fell on the ground near the back door unconscious, the upper portion of her nude body covered with cuts, bruises, and blood. Here she was found by neighbors who had heard her screams, but died shortly afterwards without regaining consciousness. This murder was deliberately planned and cunningly executed, with an ap-

parent intent either to rob or ravish the victim. The boy himself claimed he did it at the request of Hardy Smith for a pecuniary reward, but this claim cannot be reconciled with other portions of the evidence.

There is not the slightest doubt of the guilt of the defendant. No extenuating circumstances appear, excepting only his youth and want of training. The purpose of this appeal is to induce this court to modify the penalty from death to life imprisonment, on the sole ground that the perpetrator was a boy of immature years and understanding.

Elias Ridge had lived for a time in Illinois and also in Kansas City, and for a year or more just prior to this tragedy had lived with his brother-in-law and half-sister near the Adair home—a migratory negro boy without any permanent place of abode, or restraining home influences. According to the boy's own statement he was 14 years of age at the time he committed the crime; other witnesses said he would be 14 in December following. Be this as it may, the degree of intelligence and understanding of the boy, and not his exact age, constitutes the main subject for consideration in this appeal, although of course the youth of the offender carries with it a presumption of immature discretion.

This boy's mentality and capacity to commit crime were twice inquired into by the juvenile court, where he was adjudged a delinquent child who knew right from wrong. At his final trial two physicians, the brother-in-law and several other witnesses, one of whom had employed the boy for a considerable length of time, testified that he was capable of distinguishing right from wrong. The record shows ingenuity in planning the assault, and his attempted escape was so clever that for a time he deceived the officers and neighbors who were searching for the murderer, causing them to believe that the crime had been committed by another, and

helping them to look for the supposed criminal. On the other hand his writing and use of English, as shown by a long-written confession, which he made voluntarily and without being prompted by any person, covering 17 pages of tablet paper, indicate that his education was below the average, and his mind like that of an ordinary child of the third or fourth grade in school. However, from all that appears in the record, it is evident that the boy was rightfully held as being in some degree responsible for his criminal act. It appears also that he had a fair trial in which he was accorded all of his constitutional and statutory rights.

One of the chief objects of punishing criminals is to deter others from committing crime. Punishment for crime is the only method of restraint that has proved effective in this or any other age. Suppose the Governor of this state, in order to determine whether punishment for crime has a restraining influence, should by proclamation suspend the operation of all criminal laws of this state for a specified 24 hours, and revoke the power of all policemen, sheriffs, and other peace officers for that length of time, the result would be a day of murder, rape, robbery, and theft, a general violation of all public and private rights, beyond the power of description.

Law is said to be a fixed rule of action, but in modern times in criminal cases the rigidity of the rule has been relaxed, so that nearly all penal laws provide for a maximum and a minimum punishment, equivalent to a direction to the judge or jury to assess the punishment at any degree of severity between the two extremes, in a manner appropriate to the gravity of the offense and the responsibility of the offender. In addition to that, the law in this state makes it the duty of this court to modify the punishment, wherever it appears from all of the circumstances that the jury abused its

discretion by imposing a punishment not contemplated by the law as applied to that particular case.

If one seduces the wife of another, and the husband kills the seducer, that, under, the law, is murder; where one covets the wife of another, and in order to procure her kills her husband, that also is murder. But one is much more reprehensible than the other, and to punish both equally would be unjust. So it would seem that a 14 year old boy has less discretion and sense of responsibility than the man who killed another to procure his wife—two different degrees of culpability that should be punished differently. Boys of immature years are not usually endowed with that degree of discretion and sense of responsibility that is possessed by their elders.

In this state children between the ages of 7 and 16 years are presumed to be incapable of committing crime, but that presumption may be overcome by a showing made in a juvenile court that the child has sufficient understanding and intelligence to know right from wrong. The presumption at the age of 7 years would be almost conclusive, but the force of the presumption would decrease from year to year up to 16, where it entirely disappears.

We are not unmindful that the rights of society as a whole are paramount to the rights of the individual criminal who preys upon it, whether he be a boy or a person of mature years. The records of this court abound with instances where boys of high school age steal automobiles, rob banks, stores, and filling stations, and persons on the highways, and sometimes commit murder in executing these robberies. In this connection, the rights of women like Mrs. Adair and the rights of husbands and children like these must be considered. Where one takes the life of another against whom he has no grievance, for the purpose of robbery, rape, or personal gain,

this constitutes one of the most reprehensible classes of homicide known to the law—in most instances justifying the death penalty.

If this offender had been a person of mature years and understanding under circumstances like these, this court would not hesitate for a moment in affirming a death penalty. But here our juvenile statutes and the policy of the law towards juvenile offenders are involved. The state has always refused to hold children responsible for their civil contracts, and since the enactment of our juvenile statutes their criminal responsibility has been modified. It is fair to assume that since the Legislature has given to courts and juries a wide discretion between the maximum and the minimum punishment, and in addition to that has given to this court the power and duty of modifying punishments, it was the intention of the Legislature that the death penalty should be inflicted only where the offender was both culpable and responsible in the superlative degree. This crime was reprehensible in the highest degree, but the record shows that the perpetrator, by reason of his youth, his lack of home training and unfavorable environment, probably had no adequate comprehension of the enormity of the offense or of his criminal responsibility.

In all the history of our law there are few instances where young children have been put to death as a punishment for murder, and none anywhere, so far as we know, within the last 50 years. It is a hard problem to solve, but, after a most careful consideration in all of its aspects, we think that, as a matter of law, stripped of all sentimental considerations, the jury abused its discretion in assessing the death penalty, and that the sentence and judgment should be modified to life imprisonment, and that the penalty as so modified should be exacted to the limit. The record shows that this

boy is possessed of only ordinary intelligence, coupled with degenerate criminal tendencies, making it unsafe to ever again give him his liberty. For the safety of society he should be kept in the penitentiary at hard labor.

It is ordered that the punishment of Elias Ridge be reduced to imprisonment in the penitentiary for and during his natural life, and the judgment as so modified is affirmed.

MATSON, P. J., and DOYLE, J., concur.