Filed 2/28/22  Pleasanton Citizens for Responsible Growth v. City of Pleasanton CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| PLEASANTON CITIZENS FOR RESPONSIBLE GROWTH, <br><br>     Petitioner and Appellant, <br><br> v. <br><br> CITY OF PLEASANTON, <br><br>     Respondent; <br><br> COSTCO WHOLESALE CORPORATION, <br><br>     Real Party in Interest and Respondent. | A161855 <br><br> (Alameda County Super. Ct. No. RG20057095) |

Petitioner Pleasanton Citizens for Responsible Growth (PCRG) appeals from the denial of its petition for writ of administrative mandate pursuant to the California Environmental Quality Act (CEQA),[1] challenging the certification of an environmental impact report by respondent City of

_____

[1] Public Resources Code, section 21000 et seq.  Undesignated statutory references are to the Public Resources Code.  References to "Guidelines" are to "the regulations promulgated by the Secretary of the Natural Resources Agency found in title 14 of the California Code of Regulations beginning at section 15000. . . ."  (*Schellinger Brothers v. City of Sebastopol* (2009) 179 Cal.App.4th 1245, 1256, fn. 12.)

1

Pleasanton (city) for the construction of a Costco Wholesale Corporation (Costco) retail store and gas station and other commercial developments. PCRG contends the city did not follow procedures required under CEQA by (1) failing to include an actual assessment of the cumulative traffic and air quality impacts of the project in combination with three other projects, and (2) failing to respond to public comments concerning such impacts with good faith and reasoned analysis. We conclude that PCRG's claims challenging the adequacy of the analysis and comment responses related to traffic impacts are moot in light of recent amendments to the CEQA Guidelines, and we reject its similar claims related to air quality impacts. Accordingly, we affirm.

## BACKGROUND

### The Project

In 2009, the city approved an update to its General Plan, which included an economic and fiscal element that contained an aggressive program to retain and expand business. Part of this program is the project at issue here, which is known as the Johnson Drive Economic Development Zone project (hereafter, the "project" or "JDEDZ"). The project would change the city's land use designations and zoning of land situated along Johnson Drive near the I-680 and Stoneridge Drive within the city for various commercial and industrial uses, including the construction of a Costco warehouse store and gas station.

### The EIRs and the Project Approvals

In September 2015, the city released the Draft Supplemental Environmental Impact Report (Draft SEIR). The Draft SEIR incorporated by reference the "Johnson Drive EDZ Transportation Impact Analysis," prepared by Fehr and Peers Transportation Consultants in May 2015, which

2

analyzed the effect that the project would have on traffic conditions on roadways and freeways within the vicinity of the project site.  That analysis used a "level of service" (LOS) measurement to describe traffic congestion and delay at intersections based on the amount of traffic each roadway can accommodate in light of factors such as speed, travel time, delay, and freedom to maneuver.[2]  The analysis rated intersections on an LOS scale of "A" through "F," with A representing free-flowing conditions and F representing congested conditions.  The city sought to maintain an LOS D or better for peak hour intersection operations.

The Draft SEIR explained that "[c]umulative traffic operating conditions, and the contribution of development facilitated by the proposed EDZ to those cumulative conditions, were analyzed on the basis of forecasts from approved, pending, and reasonably foreseeable projects."  The forecasts "were developed using the [city's] computerized traffic model and represent likely traffic conditions in the area over the next 20 to 25 years" (hereafter, "traffic model").  Further, "[a]djustments were made to the forecasts to reflect additional information that became available since the development of the traffic model . . . ."  The Draft SEIR also used the traffic model to forecast

_____

[2] The Draft SEIR also noted that Senate Bill No. 743 (2013–2014 Reg. Sess.), signed in September 2013, made significant changes to how transportation would be assessed under CEQA.  It anticipated that vehicle miles traveled (VMT) would be the new metric, and it estimated information based on VMT for informational purposes.  The Draft SEIR calculated VMT and VMT per capita were predicted to result in "a slight increase" from the development of the project.  As will be seen, pursuant to section 21099, subdivision (b), the Secretary of the Natural Resources Agency certified Guidelines section 15064.3 in December 2018.  Effective July 1, 2020, Guidelines section 15064.3 provides that "a project's effect on automobile delay shall not constitute a significant environmental impact" and now identifies VMT as the proper metric for analyzing transportation impacts.

cumulative traffic impacts in 2025 and 2040 on certain freeway and surface street segments that make up the Metropolitan Transportation System (MTS).

In the Draft SEIR, the cumulative traffic impacts were described as follows: "The results of the LOS calculations indicate that with planned development in [the city] and adjacent jurisdictions, through the cumulative condition, all study intersections would operate at LOS D or better." Additionally, the Draft SEIR stated that cumulative traffic impacts on the I-680 mainline segments were considered less than significant. And the results of the MTS roadway forecast for 2025 and 2040 traffic conditions "indicate that the proposed project would not result in deficient operations on any of the MTS roadway segments, . . . and no project specific mitigation is required beyond payment of local and regional transportation impact fees." However, the Draft SEIR found the project would degrade traffic conditions below LOS D at certain specified intersections and freeway ramps, resulting in significant impacts requiring mitigation measures.

The Draft SEIR also analyzed the project's cumulative impacts on air quality, using the methodology identified by the Bay Area Air Quality Management District (BAAQMD), the regional agency primarily responsible for developing air quality plans for the Bay Area. The Draft SEIR noted that "[i]mpacts are assessed by modeling the estimate daily emissions generated by construction and operations activities within the EDZ area using the [California Emissions Estimator Model] CalEEMod[3] land use emissions

---

[3] The CalEEMod "is a statewide land use emissions computer model designed to provide a uniform platform for government agencies, land use planners, and environmental professionals to quantify potential criteria pollutant and greenhouse gas . . . emissions associated with both construction and operations from a variety of land use projects." (CalEEMod, California

4

model . . . . Emissions are then compared to the BAAQMD 2011 significant criteria." The Draft SEIR concluded that the project, when combined with past, present, and other reasonably foreseeable developments in the vicinity, would result in significant and unavoidable cumulative air pollutant air quality impacts.

In March 2016, the city released the Final Supplemental Environmental Impact Report (Final SEIR). The city, however, delayed its consideration of the project in 2016 while the city's voters considered an initiative that would have limited the size of new uses in the project area. The initiative was defeated in November 2016, after which the city resumed its review of the project. One year later, the city approved the project and certified the Final SEIR.

In December 2017, PCRG filed a lawsuit seeking rescission of the city's approval of the project and certification of the Final SEIR. PCRG alleged the city violated CEQA for failing to provide an adequate analysis of the project's air quality impacts in the Final SEIR. In September 2018, the city voted to rescind the project approvals and perform supplemental air quality analyses, and PCRG dismissed the lawsuit.

In July 2019, the city prepared and circulated the Partial Recirculated Draft Supplemental Environmental Impact Report (Draft RSEIR), which included the updated air quality analyses. In those analyses, the city determined that the project's air pollutant emissions were less than significant, a change from its prior finding that such emissions were significant and unavoidable.

---

Emissions Estimator Model®, <http:// http://www.aqmd.gov/caleemod/> [as of Feb. 22, 2022].)

In response to the Draft RSEIR, the city received nearly 300 public comments. In November 2019, the city prepared the Partial Recirculated Final Supplemental Environmental Impact Report (RFSEIR), which contained its responses to the comments. As relevant here, two city residents submitted comments questioning whether the city's air quality and/or traffic impact analyses had accounted for certain projects located in, and had been approved or were under consideration by, the City of Dublin (Dublin).

Specifically, resident Matt Sullivan commented, "There are a significant number of projects just completed or are planned soon near the project site which were not evaluated either for air quality or traffic impacts." Sullivan then listed several projects in Dublin, including (1) the development of a Kaiser medical campus, with an adjoining retail center located approximately two miles east of the project site, that Dublin recently approved (hereafter, "Kaiser project"), and (2) the development a commercial-residential center approximately 3,400 feet west of the project side that was still under consideration (hereafter, "At Dublin project").

In "Response 13-6" in the RFSEIR, the city responded as follows: "To the extent that the comment is suggesting that the Draft SEIR's broader analysis of air quality and traffic impacts did not account for future cumulative development growth in the region, the comment is incorrect . . . . All of the Draft SEIR's analyses of these issues (the analysis of traffic and air quality impacts initially presented in the Draft SEIR, and the 2019 Recirculated Air Quality Analysis) were based on models that accounted for regional cumulative growth. These models have already effectively accounted for individual development projects such as those identified in the comment, as the models assume that future development will occur in a manner that is generally consistent with the general plan and zoning of each site.

6

Specifically, the JDEDZ Transportation Assessment (March 2015; Chapter 6, page 57) states the following:

"Preliminary traffic forecasts for the Cumulative scenario were obtained from city staff, representing existing traffic, **_plus traffic from approved and pending developments, as well as development that could occur under the current General Plan_.** These forecasts were developed using the City of Pleasanton computerized traffic model and **_represent likely traffic conditions in the area over the next 20 to 25 years_**. Adjustments were made to the forecasts to reflect additional information that became available since the development of the traffic model . . . . [¶] . . . [¶]

"The traffic and air quality models used in the Draft SEIR already anticipated future development consistent with future development projections in the general plans of the cities of Pleasanton and Dublin. This analysis accounted for each of the 11 projects identified in the comment, with two arguable exceptions, as discussed below: [¶] . . . [¶]

"(5) *Kaiser Permanente* (approximately 2,400 feet west of the project site): The City of Dublin approved this project in 2016 and the facility opened in 2018. The project is consistent with the Dublin General Plan and its cumulative impacts are within the scope of the traffic and air quality models used in the Draft SEIR.

"(6) *At Dublin (Shea Properties)* (approximately two miles east of the project site): The City of Dublin is considering an application for a general plan amendment for this project, for which the City prepared a final EIR in October 2018. Although the project thus requires a general plan amendment, the current Dublin General Plan already contemplates substantial development of that site . . . . The project will increase the number of

7

residential units to 680 and reduce the amount of commercial uses to 454,500 square feet. The traffic and air quality models used in the Draft SEIR thus do not fully account for the cumulative impacts of this proposed development, but they account for much of the effect. However, because the At Dublin project was applied for only recently (the City of Dublin initiated the general plan amendment in October 2017), the City of Pleasanton finds that it would not be reasonable to re-run the traffic and air quality modeling to fully account for the specific details of this project."[4]

Another city resident, Craig Schwab, submitted a similar comment asking the city whether there had "been a new traffic study since 2016 to include new local, and regional projects like IKEA"—referring to another project under review to build an IKEA retail center in Dublin (hereafter, "IKEA project"). In Response 12-10, the city replied, "The comment suggests that the Draft SEIR's traffic analysis does not account for recently completed projects. See Response to Comment 13-6, which thoroughly explains the adequacy of the Draft SEIR with respect to the analysis of cumulative traffic and air quality impacts."

In February 2020, PCRG's counsel submitted a letter to the city on behalf on behalf of PCRG criticizing the RFSEIR for not adequately considering other pending or approved projects. Counsel wrote: "Other than

---

[4] Response 13-6 goes on to address Sullivan's additional concern about whether the city included the other projects in its analysis of cumulative air quality impacts. The city determined that "a separate estimate of emissions associated with cumulative projects is not required. Consequently, the commenter's request that the 2019 Recirculated Air Quality Analysis quantify these emissions is unwarranted and the current cumulative analysis is adequate." As discussed below, PCRG does not address this specific finding in Response 13-6, allowing us to treat as forfeited any arguments pertaining to the RFSEIR's analysis of air quality impacts and responses to public comments regarding the same.

general statements that the various projects listed are consistent with the Dublin and/or Pleasanton General Plan, and were thus assumed by the cumulative traffic analyses in those Plans' years-old EIRs, there is no further discussion of this Project's potential cumulative traffic impacts considering the actual traffic generated by the other projects."

PCRG's counsel attached a letter from Dan Smith of Smith Engineering & Management, its traffic and transportation consultant. Smith stated he had reviewed the RFSEIR and found that the 2015 Draft SEIR's traffic and transportation analysis was "critically flawed." That analysis and the city's responses to Sullivan's comments in the RFSEIR, Smith argued, were based on a "vaguely described and undocumented traffic model," the reliability of which was unsubstantiated. He also disputed the city's response that it had analyzed some of the projects identified in Sullivan's comment, namely the Kaiser, IKEA, and At Dublin projects. Thus, Smith opined that the RFSEIR was "clearly inadequate" and "[i]t should be revised to be responsive to the transportation issues raised herein and be re-circulated in draft status."

On February 4, 2020, the city's Planning Commission considered the project and RFSEIR at a public hearing and following that hearing, approved the project and certified the RFSEIR.

**The Petition for Writ of Mandate**

On March 4, PCRG filed in the Alameda County Superior Court a petition for writ of mandate "commanding the City to set aside its certification of the EIR and its approval of the Project." In their opening brief, PCRG argued that the city failed to proceed in the manner required by CEQA in two ways: first, in failing to assess the Kaiser, At Dublin, and IKEA projects within the RFSEIR's cumulative impact analyses on traffic and air quality, and second, in failing to respond to Sullivan's and Schwab's

9

comments "with good-faith, reasoned analysis."[5]  According to PCRG, a de novo and not a substantial evidence standard applied to the trial court's review of all of PCRG's claims.

The city, joined by Costco, opposed the petition.  They disputed the standard of review advanced by PCRG, arguing that PCRG's arguments presented factual questions and were thus subject to the substantial evidence standard.  The city and Costco asserted under that standard, PCRG was required but failed to "summarize the relevant evidence supporting the city's determinations and then explain why it is inadequate."  As such, they argued, PCRG "fails to affirmatively prove the RFSEIR did not adequately analyze cumulative impacts by taking into account other development projects, including projects in Dublin."  And they refuted the assertion that the RFSEIR did provide a good faith, reasoned analysis in response to public comments.

PCRG filed a reply, disputing the applicability of the substantial evidence standard.

On November 13, the trial court held a hearing on the petition, and on November 17, denied the petition and entered judgment in favor of the city and Costco.  The court ruled as follows:  "A.  The substantial evidence standard applies to the Court's review of [PCRG's] challenges.

"B.  There is substantial evidence in the record demonstrating that the RFSEIR adequately considered the three Dublin projects identified by

---

[5] Along with the petition, PCRG filed a request for judicial notice of a copy of a resolution to amend the land use designation of the Kaiser project. The trial court denied the request.  On August 10, 2021, PCRG filed in this court a motion for judicial notice of the same document, and the city and Costco opposed the motion.  We deny PCRG's motion for judicial notice as the additional document is not necessary to resolve this appeal.

[PCRG] in the RFSEIR's analysis of the Project's cumulative traffic and air quality impacts.

"C. There is likewise substantial evidence in the record supporting the adequacy of the RFSEIR's responses to comments 12-10 and 13-6, and the Court finds that those responses included good faith reasoned analysis in compliance with the requirements of CEQA Guidelines section 15088."

This appeal followed.[6]

## DISCUSSION

PCRG reasserts the same arguments it raised in the trial court: that the city did not proceed in the manner required by CEQA because it (1) failed to account for the three Dublin projects in its analysis of the cumulative impacts on traffic and air quality, and (2) failed to provide a good faith and reasoned analysis in response to Sullivan's and Schwab's comments. We will analyze the challenges related to the traffic impacts separately from those related to air quality, as certain CEQA laws uniquely apply to the assessment of the former category. Before we do so, we briefly summarize how CEQA operates.

**General CEQA Principles**

A public agency must prepare an EIR for any project that it proposes to carry out or approve that may have a significant effect on the environment. (§§ 21100, subd. (a), 21151, subd. (a); Guidelines, § 15064, subd. (a)(1).) "[A]n EIR is 'an informational document'" and its purpose "'is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment.'" (*Laurel*

---

[6] Subsequently, the city filed the respondent's brief, and Costco, a joinder in that brief and a separate response brief.

11

*Heights Improvement Association of San Francisco, Inc. v. The Regents of the University of California* (1988) 47 Cal.3d 376, 391 (*Laurel Heights I*).)

Among other discussions, an EIR must discuss a cumulative impact if the project's incremental effect combined with the effects of other projects is "cumulatively considerable." (Guidelines, § 15130, subd. (a).) " 'The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonabl[y] foreseeable probable future projects. Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time.' (CEQA Guidelines, § 15355, subd. (b).) 'Cumulative impact analysis "assesses cumulative damage as a whole greater than the sum of its parts." ' [Citation.]" (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1403.)

The CEQA process begins with notice to the public that the lead agency is preparing a draft EIR. (§ 21092; Guidelines, § 15087; *Laurel Heights I*, *supra*, 47 Cal.3d at p. 391.) After public review, the draft EIR responds to comments that raise significant environmental issues. (§§ 21091, subds. (a), (d), 21092; Guidelines, § 15088.) The lead agency then prepares a final EIR, including any revisions to the draft EIR, the comments received from the public and other agencies, and responses to comments. (Guidelines, §§ 15089, subd. (a), 15132.)

The final substantive step in the EIR review process is certification of the final EIR. The lead agency is required to certify that the final EIR has been completed in compliance with CEQA, and that it reviewed and considered the information in the final EIR prior to approving the project. (Guidelines, § 15090, subd. (a).) CEQA also requires that, before approving a

project, the lead agency "find either that the project's significant environmental effects identified in the [final] EIR have been avoided or mitigated, or that unmitigated effects are outweighed by the project's benefits. (§§ 21002, 21002.1 and 21081; Guidelines, §§ 15091–15093.)" (*Laurel Heights I, supra*, 47 Cal.3d at p. 391.)

Upon a challenge to set aside a decision of an agency for failing to comply with CEQA, we review the agency's action, not the trial court's decision. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 (*Vineyard*).) The city's determinations are reviewed for prejudicial abuse of discretion. (§ 21168.5; *Vineyard, supra*, 40 Cal.4th at p. 426.) An agency abuses its discretion under CEQA if it " 'has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' " (*Vineyard*, at pp. 426–427.) And within this abuse of discretion standard, review varies depending on the issue involved. " 'While we determine de novo whether the agency has employed the correct procedures' " (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512), we review the agency's factual determinations for substantial evidence. (*Vineyard, supra*, 40 Cal.4th at p. 427.)

**Traffic Impacts**

PCRG argues that the analysis on the cumulative impact on traffic conditions was inadequate because it did not include an actual assessment of the impact of this project in combination with three other projects that were approved or under consideration by Dublin. Specifically, PCRG disputes the city's determination that the Kaiser, At Dublin, and IKEA projects were accounted for in its forecast of future cumulative traffic impacts using the traffic model. In PCRG's view, it was "reasonable and practical" for the city

13

to re-run the traffic model as to each of three projects, the city thus should have re-run the model, and its failure to do so renders the cumulative traffic impact analysis inadequate. Additionally, PCRG asserts a related argument that the city's responses to public comments on whether it considered the three projects in its traffic impact analysis were not made in good faith and with reasoned analysis.

Costco responds that we need not consider any of the arguments related to traffic impacts because they have been rendered moot by recent amendments to the Guidelines.[7] (*Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, 625 (*Citizens for Positive Growth*).) PCRG effectively concedes this point. We agree with Costco.

Guidelines section 15064.3 was promulgated pursuant to section 21099, subdivision (b) and certified by the Secretary of the Natural Resources Agency, before being approved by the Office of Administrative Law in December 2018. (*Citizens for Positive Growth*, *supra*, 43 Cal.App.4th at p. 625.) Guidelines section 15064.3 "describes specific considerations for evaluating a project's transportation impacts" and provides that, except for roadway capacity projects, "a project's effect on automobile delay shall not constitute a significant environmental impact." (Guidelines, § 15064.3, subd. (a).) Guidelines section 15064.3 became effective July 1, 2020, after the city certified the RFSEIR and approved the project, and it applies prospectively. (Guidelines, §§ 15064.3, subd. (c), 15007, subd. (b).)

---

[7] Costco states that to the extent PCRG's appeal also presents a "vague" challenge to the RFSEIR's analysis of air quality impacts, such challenge is not moot.

14

In light of the recent amendments to the CEQA guidelines, both PCRG's challenge to the RFSEIR's cumulative traffic impacts analysis and its challenge to the RFSEIR's response to public comments on such impacts are moot. (*Citizens for Positive Growth*, *supra*, 43 Cal.App.5th at pp. 625–626; *Ocean Street Extension Neighborhood Association v. City of Santa Cruz* (2021) 73 Cal.App.5th 985, 1021.) Both of PCRG's claims rely on the premise that the project's cumulative traffic impacts constitute significant impacts within the meaning of CEQA. PCRG's arguments also suggest that the city should have re-run the 2015 traffic model to include the three Dublin projects, a model that used the LOS measurement to describe traffic congestion and delay. However, under existing law, the project's impacts on LOS cannot constitute a significant environmental impact. (Guidelines, § 15064.3, subd. (a); § 21099, subd. (b)(2).) Because LOS-based traffic analysis is no longer a consideration to determine if a project's impact is significant, the city would be under no obligation to conduct a LOS-based analysis on remand.[8] (*Citizens for Positive Growth*, 43 Cal.App.5th at pp. 625–626; *Ocean Extension Neighborhood Association v. City of Santa Cruz*, *supra*, 73 Cal.App.5th at p. 1021.)

**Air Quality Impacts**

PCRG also purports to challenge the adequacy of the city's analysis of, and responses to public comments on, the project's cumulative impacts on air quality. The city and Costco counter that to the extent PCRG actually raises

---

[8] As explained above, the Guidelines now identify VMT as the proper metric for analyzing transportation impacts. (Guidelines, § 15064.3, subd. (a).) The city separately addressed the project's potential impact on traffic using the VMT metric that was proposed at the time by Senate Bill No. 743 and concluded the impact would not be significant. PCRG does not challenge this analysis or determination on appeal.

15

arguments concerning air quality impacts, as distinct from traffic impacts, the arguments are "vaguely" asserted and "inscrutable." The city and Costco thus argue that PCRG's failure to set forth any cogent argument with respect to air quality impacts forfeits any such argument on appeal. PCRG does not offer any meaningful rebuttal to that counter-argument. We agree with the city and Costco.

The argument section of PCRG's opening brief includes the heading stated as follows: "The SEIR's cumulative impact analysis unlawfully omitted relevant projects that were reasonable and practical to include, thus failing to adequately reflect the Project's cumulative traffic *and air quality impacts*." (Italics added.) PCRG makes similar statements elsewhere in its brief.

Despite those statements, it is clear from a closer reading of PCRG's briefs that its arguments are aimed at attacking the validity of the city's analysis only with respect to *traffic* impacts. First, as the city and Costco observe, PCRG "offers no explanation as to what part of the RFSEIR's analysis of cumulative air quality impacts it actually thinks is defective." Second, PCRG "makes *no attempt* to summarize the RFSEIR's analysis of air quality impacts or to challenge its conclusion that development of the JDEDZ will have a less than significant impact on air quality." Third, PCRG repeatedly refers to the three Dublin projects, which it claims the city had not adequately considered, as "traffic-intensive" projects. Fourth, in its discussion on how the city purportedly failed to account for those projects, PCRG repeatedly argues that the city should have "re-run its *traffic* model" for each of the three projects. (Italics added.) Fifth, PCRG frequently relies on the letter prepared by its traffic consultant, who provided traffic-based criticisms of the RFSEIR.

16

Likewise, it is also evident that PCRG's challenge to the city's responses to comments is directed only at the responses concerned with traffic impacts. Of the two comments at issue here, only the comment from resident Sullivan mentioned air quality. In arguing the city's responses to Sullivan's comment were deficient, PCRG cites to only the portions of the responses that referenced or were based on the traffic model, and again relies on its traffic consultant's criticisms of those responses.

All of the above indicates that PCRG is not raising a direct challenge to the adequacy of the city's analysis of, and responses to comments pertaining to, the project's cumulative impacts on air quality. Instead, PCRG essentially piggybacks those claims onto those directed at the city's findings on traffic impacts. Assuming PCRG is advancing distinct arguments related to air quality impacts, its failure to develop them with any cogent argument forfeits them on appeal, and we would be justified in disregarding them. (*Citizens for Positive Growth*, *supra*, 43 Cal.App.4th at pp. 629–631, citing *In re Steiner* (1955) 134 Cal.App.2d 391, 399 [" 'A point which is merely suggested by appellant's counsel, with no supporting argument or authority, is deemed to be without foundation and requires no discussion' "]; *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1245, fn. 14 [same]; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 [same].)

In any event, to the extent we follow PCRG's arguments, we would reject them. As to the first argument purportedly challenging the adequacy of the RFSEIR's analysis on the project's air quality impacts, the parties strongly disagree on the applicable standard of review. PCRG asserts that the claim presents a legal question subject to independent review. The city and Costco disagree, arguing that PCRG's argument is a factual

determination that calls for the substantial evidence standard of review. We agree with the city and Costco.

Throughout its opening brief, PCRG asserts it was "reasonable and practical" for the city to re-run its computerized models to account for the three Dublin projects in its traffic and quality impact analyses. It also refers us to the letter of its traffic consultant, who questioned the data and methodology of the traffic model and opined that the RFSEIR "should be revised to be responsive to the transportation issues raised herein and be re-circulated in draft status." Thus, PCRG is essentially arguing that the 2015 Draft SEIR needed to be revised and recirculated to reflect the new projects that were approved or under consideration by Dublin. As the trial court put it, "[PCRG's claim] isn't a challenge to the scope of the impact analysis. This is a challenge to whether or not their rationale for not running an independent study or to update their traffic modeling is reasonable or not reasonable. . . ." Accordingly, the substantial evidence standard applies to PCRG's claim. (*Laurel Heights Improvement Association of San Francisco, Inc. v. The Regents of the University of California* (1993) 6 Cal.4th 1112, 1135 ["the substantial evidence standard set forth in section 21168.5 governs the [city's] decision not to recirculate the EIR in this case"]; accord, *Vineyard, supra*, 40 Cal.4th at pp. 426–427.)

"As with all substantial evidence challenges, an appellant challenging an EIR for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking. Failure to do so is fatal. A reviewing court will not independently review the record to make up for appellant's failure to carry his burden." (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266.) PCRG fails to set forth any of the evidence

18

concerning the RFSEIR's analysis of cumulative air quality impacts. On this basis, its claim fails.

We also reject PCRG's second argument that the RFSEIR's responses to public comments were inadequate. In light of our conclusion that PCRG's claims pertaining to traffic impacts are moot, we consider only the comments that addressed air quality. As noted, resident Sullivan commented that there were "a significant number of projects just completed or are planned soon near the project site which were not evaluated either for air quality or traffic impacts." The city responded: "All of the Draft SEIR's analyses of these issues (the analysis of traffic and air quality impacts initially presented in the Draft SEIR, and the 2019 Recirculated Air Quality Analysis) were based on models that accounted for regional cumulative growth. These models have already effectively accounted for individual development projects such as those identified in the comment, as the models assume that future development will occur in a manner that is generally consistent with the general plan and zoning of each site." The city then referred specifically to its application of the BAAQMD's standards for determining whether the project's air pollutants and health risks would be cumulatively considerable.

"Responses to comments need not be exhaustive; they need only demonstrate a 'good faith, reasoned analysis.' " (*Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 378 (*Eureka Citizens*); Guidelines, § 15088, subd. (c).) "The sufficiency of the agency's responses to comments on the draft EIR turns upon the detail required in the responses, and where a general comment is made, a general response is sufficient." (*Eureka Citizens*, *supra*, 147 Cal.App.4th at p. 378; Guidelines, § 15088, subd. (c).) "And because, ultimately, responses to comments are part of the EIR itself, their sufficiency should be 'viewed in

19

light of what is reasonably feasible.' " [9]  (*City of Irvine v. County of Orange* (2015) 238 Cal.App.4th 526, 550 (*City of Irvine*).)

PCRG contends that the city's response did not meet these standards because it "neither includes, cites, nor references information in the SEIR or elsewhere" and "leaves several critical questions unanswered."  We disagree. Contrary to PCRG's assertion, the city's response clearly cites and provides specific information from the draft SEIR as to whether and how it analyzed the new projects in its air quality impact analysis.  This response was sufficient.  (See *City of Irvine, supra*, 238 Cal.App.4th at p. 550 ["A response can be sufficient if it refers to part of the draft EIR that analyzes the impacts raised by the comment"].)  PCRG's insistence that the city should have provided more detail is unpersuasive.  Sullivan asked a general question whether certain projects were evaluated in the city's air quality analysis:  he did not ask for the specific data or methodology underlying that analysis. Given the general nature of the comment, the city's response was sufficient. (See *Eureka Citizens, supra*, 147 Cal.App.4th at p. 378.)

PCRG also argues that the city's response contains contradictory and misleading statements because the city falsely described the approach it used to analyze cumulative impacts and made an incorrect assumption regarding the Kaiser project.  However, PCRG's arguments amount to a disagreement with the city's factual and legal conclusions, rather than raise a doubt as to the good faith of the response.  But disagreement over the responses does not render the response inadequate.  (See *North Coast Rivers Alliance v. Marin Municipal Water District Board of Directors* (2013) 216 Cal.App.4th 614,

---

[9] The parties again disagree on the standard for reviewing the sufficiency of the city's responses.  Even assuming PCRG is correct that the less onerous, independent review standard applies, we would still conclude the city's responses were adequate.

634–635 [" '[T]he fact that [the Alliance] disagree[s] with the responses . . . does not render the responses inadequate' "]; *Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455, 476.) In short, we see nothing inadequate in the responses provided by the city.

## DISPOSITION

The judgment is affirmed. The city and Costco shall recover their costs on appeal.

_____
Richman, Acting P. J.

We concur:


_____
Stewart, J.


_____
Mayfield, J. *


*Pleasanton Citizens for Responsible Growth v. City of Pleasanton* (A161855)

     *Superior Court of Mendocino County, Judge Cindee Mayfield, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.